# URBAN DEVELOPMENT FUND, LLC

## Amended and Restated
## Limited Liability Operating Agreement

### *Introduction*

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT is dated as of July 1, 2002, and is made between the persons identified on the signature page hereof, as members (the "Members"), on the following terms and conditions:

WHEREAS, the Members have formed a Delaware limited liability company known as URBAN DEVELOPMENT FUND, LLC (the "Company") pursuant to the Delaware Limited Liability Company Act (the "LLC Act"); and

WHEREAS, the Members wish to create an Amended and Restated Limited Liability Company Operating Agreement to establish the rules and procedures that are to govern the conduct of the business and affairs of the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and consideration set forth in this Agreement, the Members, intending to be legally bound to this Agreement by affixing their signatures, hereby amend and restate in its entirety the initial Limited Liability Company Operating Agreement of the Company dated as of the date hereof by replacing it with this Agreement, and hereby mutually covenant and agree as follows:

## ARTICLE ONE          Definitions, Headings, Gender and Number

1.1      Definitions.
The following words and phrases will have the following particular meanings in this Agreement.

"Act" means the Delaware Limited Liability Company Act as amended from time to time.

"Adjusted Capital Account Deficit' means, at any time with respect to any Member, the deficit balance, if any, in such Member's Capital Account, after giving effect to the following adjustments:

Such Capital Account shall be increased by the amounts which such Member is deemed obligated to restore as described in the penultimate sentence of Treasury Regulation Section 1.704-2(g)(1) and Treasury Regulation Section l.7042(i)(5), or any successor provisions; and

Such Capital Account shall be reduced by the amount of the items described in Treasury Regulation Sections l.704-l(b)(2)(ii)(d)(4), (5) and (6).

The definition of Adjusted Capital Account Deficit is intended to comply with Treasury Regulation Section l.704-l(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Agreement" means this Amended and Restated Limited Liability Company Operating Agreement, and any amendments thereto.

"Capital Account" means, with respect to any Member, such Member's Capital Contribution to the Company as adjusted in accordance with Section 6.2 hereof.

"Certificate" means the Certificate of Formation filed with the state of Delaware for the purpose of forming the Company.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means URBAN DEVELOPMENT FUND, LLC, a limited liability company formed and constituted and governed under and pursuant to the Act, the Certificate and this Agreement, as such limited liability company may from time to time be constituted.

"Company Minimum Gain" has the meaning set forth in Treasury Regulation Section 1.704-2(d).

"Contribution" means any cash, property, services rendered, or a promissory note or other binding obligation to contribute cash or property or to render services that a Member contributes to the Company in his or her capacity as a Member.

"Distribution" means the transfer of Property by the Company to one or more of its Members in his or her capacity as a Member.

"Fiscal Year" means the calendar year.

"Majority In Interest of the Members" means, unless otherwise provided in this Agreement, the Members whose aggregate share of the current Profits of the Company constitutes more than one-half of the aggregate of such shares of all Members.

"Manager" means a Person designated by the Members to manage the property, business and affairs of the Company as provided in Section 4.2 of this Agreement.

"Member" means a Person who has been admitted as a member of the Company and has a Membership Interest in the Company with the rights, obligations, preferences and limitations specified herein.

"Membership Interest" means a Member's aggregate rights in the Company, including, without limitation, the Member's right to a share of the Profits and Losses of the Company, the right to receive Distributions from the Company and the right to vote and participate in the management of the Company.

"Net Cash Flow" means, for each Fiscal Year or other period of the Company, the gross cash receipts of the Company from all sources.

Net Cash Flow excludes any amounts that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, such as gross receipts taxes,

Net Cash Flow shall be reduced by all amounts paid by or for the account of the Company during the same Fiscal Year or other period (including, without limitation, payments of principal and interest on any Company indebtedness, payment of a management fee to the Managers pursuant to Section 4.11 hereof and expenses reimbursed to the Managers under Section 4.12 hereof).

Net Cash Flow shall also be reduced by any amounts determined by the Managers to be necessary to provide a reasonable reserve for working-capital needs or any other contingencies of the Company.

Net Cash Flow shall be determined in accordance with the cash receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied.

Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other noncash items, but shall be increased by any reduction of reserves previously established.

"Office" means the office of the Company, the location of which is stated herein.

"Person" means any association, corporation, joint stock company, estate, general partnership, limited association, limited liability company, joint venture, limited partnership, natural person, real estate investment trust, business trust or other trust, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Profits" or "Losses" means, for any Fiscal Year or portion thereof, the taxable income or taxable loss of the Company for such Fiscal Year or portion thereof, as determined for federal income tax purposes, increased by the amount, if any, of tax-exempt income received or accrued by the Company and reduced by the amount, if any, of all expenditures of the Company described in Section 705(a)(2)(B) of the Code (including expenditures treated as if they were included in Section 705(a)(2)(B) of the Code under Treasury Regulation Section l.704-l(b)(2)(iv)(i)).

"Property" means all real, personal and mixed properties, cash, assets, interests and rights of any type owned by the Company.  All assets acquired with Company funds or in exchange for Company Property shall be Company Property.

"Tax Matters Member" means a Member of the Company designated by the other Members pursuant to Section 4.2 hereof to act as tax matters partner of the Company for purposes of Subchapter C of Chapter 63 of Subtitle F of the Code.

"Treasury Regulations" means the Income Tax Regulations (final, temporary and, as applicable, proposed) promulgated under the Code.

Section 1.2       Headings
The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

Section 1.3       Gender and Number
Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, the feminine and the neuter.

**ARTICLE TWO       Continuation, Name, Purpose and Character of Business, Place of Business, Term**

Section 2.1       Name of Company.
The name of the Company formed and continued hereby is URBAN DEVELOPMENT FUND, LLC.

Section 2.2       Purpose and Character
2.2.1     Generally, the Company is formed for the purpose of engaging in any lawful act or activity for which limited liability companies may be formed under the Act.

2.2.2     However, the primary purpose of the Company will be to promote community development and economic development in depressed and disadvantaged areas by serving and/or providing investment capital for low-income communities or low-income persons – especially those Low-Income Communities defined in IRC § 45D(e)(i), as amended from time to time.

In order to assure the achievement of the Company's primary purpose, at least 60% of the Company's Finance Contracts will be made to Low-Income Persons or will be Qualified Low Income Community Investments (as defined in IRC section 45D(d)(1)(A)) made to qualified active low-income community

business (as defined in IRC section 45D(d)(2)) or will involve the purchase of Qualified Low-Income Community Investments from a qualified Community Development Entity or ancillary financial counseling and other services related to Finance Contracts to its customer's that are located in and/or to residents of Low-Income Communities.

(b)     The Company will maintain accountability to residents of Low-Income Communities for the accomplishment of its primary purpose through representation of these persons and their interests on an Advisory Board, as provided for in this Agreement.

(c)     The Company will promote community development by making loans and leases and providing other technical and financial assistance to owners of small businesses in such communities.

(d)     The Company will primarily engage in the business of sourcing, originating, underwriting, funding, servicing, buying and selling and generally dealing in investments in Low Income communities.

(e)     The Company shall not enter into investments in such industries as shall be determined by the Manager, so long as such loans and leases have a purpose of fostering community development in low income or economically depressed or disadvantaged areas.

(f)     Incident to the Company's main activity, the Company may from time to time acquire, hold, buy, sell, mortgage and otherwise deal in tangible equipment and goods or real property.

(g)     Incident to the Company's activities, the Manager is authorized to seek to have the Company certified as a Community Development Entity as provided for under IRC 45(D)(c)(1) or as a Community Development Financing Institution under the Community Development Banking and Financial Institutions Act of 1994 (12 U.S.C. 4702) or by the appropriate local, state and federal governmental agencies.

(h)     Also incident to the Company's activities, the Manager is authorized to seek to have the Company awarded the New Markets Tax Credits provided for in IRS 45(D).

(i)     Also incident to the Company's activities, the Manager is authorized to allocate  or to specially allocate the New Market Tax Credits received to it Additional Members.

Section 2.3     Place of Business
The principal place of business of the Company shall be located in

Section 2.4.     Registered Office and Registered Agent
2.4.1    The address of the Company's registered office in the State of Delaware shall be the then-current offices of CT Corporation Systems.

2.4.2    The Company's registered agent for service of process in the State of Delaware shall be CT Corporation Systems.

Section 2.5     Term
2.5.1    The term of the Company shall begin upon the filing of the Certificate or any later effective date as set forth therein and will continue until dissolution pursuant to Article Eight of this Agreement or by law.

Section 2.6     Qualification in Other Jurisdictions
The Manager shall cause the Company to be qualified, formed, reformed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction, if such act is necessary in order to protect the limited liability of Members and the Manager or to permit the Company lawfully to transact business.

**ARTICLE THREE**       **Meetings of Members**

Section 3.1       Annual Meetings

3.1.1     Meetings of the Members shall be held annually on May 1.

3.1.2     Meetings of Members may be held at such places, within or without the State of Delaware, as shall be determined by the Manager stated in the notice of the meeting or in a duly executed waiver of notice thereof.

3.1.3     Members of the Company may participate in a meeting by means of telephone, or other electronic communications means, such as a web browser, so long as the form of participation is permitted or at least not prohibited by the Act and so long as all persons participating in the meeting can hear each other, and, when or if permitted under the rules of order of the meeting, propose questions and receive answers to such questions.

3.1.4     Such participation shall constitute presence in person at such meeting.

Section 3.2       Special Meetings.
A meeting of the Members for any purpose or purposes maybe called by the Manager and must be called at any time by the Manager upon receipt of a written request from Members of record who hold, in the aggregate, at least a Majority in Interest of Membership entitled to vote at such meeting. Such notice shall state the purpose for which such meeting is to be called.

Section 3.3       Notice of Meetings
Every member shall furnish the Company through the Managers with an address at which notices of meetings and all other notices may be served on or mailed to him or her.

Notice of each meeting of the Members shall be given to each Member entitled to vote at such meeting, no less than ten (10) nor more than sixty (60) days before the day on which the meeting is to held.

Such Notice must be given either by delivering notice personally or by written notice mailed by US Postal Service first-class service, postage prepaid in an envelope addressed to that Member at the post office address specified by that Member to the Company, or if he or she shall not have furnished to the Company any address, then at that Member's post office address last known to the Company, or, if in the absence of knowledge on the part of the Company of any such post office address, then at the office of the Company in the State of Illinois

The Notice of a meeting of the Members shall provide the place, date and hour of the meeting, indicate that it is being issued by or at the direction of the Person or Persons calling the meeting and state the purpose or purposes for which the meeting is called.

An affidavit of any Manager that Notice has been given shall, in the absence of fraud, be *prima face* evidence of the facts stated therein.

When a meeting is adjourned to another time and place, it shat not be necessary to give any Notice of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken.

Any business may be transacted at the adjourned meeting that might have been transacted at the original meeting.

Section 3.4       Waiver of Notice
Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.

The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by him or her.

Section 3.5     Quorum

A Majority in Interest of the Members of the Company entitled to vote at a meeting shall constitute a quorum for the transaction of business when present at such meeting either in person or by proxy. When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any Members.

Section 3.6     Voting

When voting on any matter that requires the vote at a meeting of the Members pursuant to the Act, the Certificate, or this Agreement, each Member shall vote in proportion to such Member's share of the current Profits in accordance with Section 6.3 of this Agreement.

Whenever any action is to be taken under the Act by the Members, it shall, except as otherwise provided, be authorized by a Majority in Interest of the Members' votes cast at a meeting of Members entitled to vote thereon.

No provision in this Agreement which provides for the vote of a percentage in interest of the Members may be amended without the consent of at least such percentage in interest of the Members.

Section 3.7     Proxies

Each Member entitled to vote at any meeting of Members may authorize another Person or Persons to act as his or her proxy by an instrument in writing signed by such Member or his or her attorney-in-fact.

Section 3.7     Action Without a Meeting

Whenever Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if consent or consents in writing, setting forth the action so taken, shall be signed by the Members who hold the voting interests having not less than the minimum number of votes that would be necessary to authorize such action at a meeting at which all of the Members entitled to vote therein were present and voted.

Such consents shall be delivered to the office of the Company by hand or by certified or registered mail, return receipt requested.

Every written consent shall bear the date of signature of each Member who signs the consent.

No written consent shall be effective to take the action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section, written consents signed by a sufficient number of Members to take the action are delivered to the office of the Company by hand or by certified or registered mail, return receipt requested.

Prompt notice of the taking of action without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

In the event that the action that is consented to is such as would have required the filing of a certificate under any Section of the Act, if such action had been voted on by Members at a meeting thereof, such certificate filed under such Section shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given as provided in the Act.

## ARTICLE FOUR    Management

Section 4.1    Management by the Manager
The management of the Company's business shall be vested in a class of one or more Managers designated by the Members.

The Members hereby designate Michael Qualizza to be the initial Manager of the Company, and Michael Qualizza does hereby accept and agrees to be bound by the terms and conditions of this Agreement.

Section 4.2    Powers of the Manager
(a)    Subject to the terms of this Agreement, the property, business and affairs of the Company will be managed, and the conduct of its business will be controlled by, the Managers.  Except as otherwise provided hereunder, the Managers shall have all of the rights, powers and obligations of a class of managers as provided in the Act and as otherwise provided by law.  Without limiting the generality of the foregoing, the Managers shall have the following powers and the Managers are authorized on behalf of the Company to do or cause to be done the following:

(i)    to supervise with respect to the property, business and affairs of the Company and hire, on behalf of the Company, such professionals or other experts as may be necessary or desirable in connection therewith;

(ii)    to determine, in their sole judgment, the amount, manner of payment and date of any Distributions to be made to the Members hereunder;

(iii)    to make any and all filings on behalf of the Company and its Members as they shall deem necessary, including, without limitation, filings of certificates with the Secretary of State of Delaware and the filing of such documents, forms and requests for exemption as may be required pursuant to federal and state securities laws;

(iv)    to make such filings with governmental and other authorities and to take any and all other actions as may be necessary to maintain the limited liability of the Members of the Company;

(v)    to establish and maintain bank accounts, including savings accounts and demand deposit accounts, and cash management accounts; and

(vi)    generally to do all things in connection with any of the foregoing, generally manage, oversee and administer the property, business and affairs of the Company and execute all documents on behalf of the Company in connection therewith, and sign or accept all checks, notes and drafts on the Company's behalf and, except as expressly restricted herein, pay as Company expenses all costs or expenses connected with the operation or management of the Company.

(b)    In the event that the Company makes an in-kind Distribution described in Section 734 of the Code, or in the event of a transfer of any Membership Interest permitted by this Agreement made and described in Section 743 of the Code, the Managers, on behalf of the Company, may, in their absolute discretion, file an election under Section 754 of the Code in accordance with the procedures set forth in the applicable Treasury Regulations promulgated thereunder.

(c)    The Members shall cause there to be all times one Manager that is a Member of the Company that shall be the Tax Matters Member of the Company.

Section 4.3    Managers as Agents
The Managers shall be agents of the Company for the purpose of transacting its business, and the acts of the Managers, including the execution in the name of the Company of any instrument, for apparently carrying on in the usual way the business of the Company shall bind the Company, unless:

(1) the Manager acting has in fact no authority to act for the Company in the particular matter, and

(2) the Person with whom such Manager is dealing has knowledge of the fact that such Manager has no such authority.

No Member, solely by reason of being a Member, shall be an agent of the Company for the purpose of transacting its business except to the extent that authority has been expressly delegated to such Member in writing by the Managers or by the provisions in this Agreement.

An act of a Member or the Managers that is not apparently for the carrying on of the business of the Company in the usual way shall not bind the Company unless authorized in fact by the Company in the particular matter.

No act of a Member, a Manager or other agent of the Company in contravention of a restriction on authority shall bind the Company to Persons having knowledge of such restriction.

Section 4.4    Duties of Manager.
(a)    Each Manager shall perform his or her duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

In performing their duties, each Manager shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:
(1) one or more agents or employees of the Company, or
(2) counsel, accountants or other Persons as to matters that such Manager believes to be within such Person's professional or expert competence, provided such Manager has no knowledge concerning the matter in question that would cause such reliance to be unwarranted.

A Person who so performs his or her duties in accordance with this Section shall have no liability by reason of being or having been a Manager of the Company.

(b)    This Section 4.4 will not eliminate or limit:
(1) the liability of a Manager for judgments or other final adjudication adverse to him or her establishes that his or her acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he or she personally gained in fact a financial profit or advantage to which he or she was not legally entitled or that with respect to a Distribution, his or her acts were not performed in accordance with Section 4.4 of this Article, or
(2) the liability of a Manager for any act or omission prior to the adoption of a provision authorized by the Act.

(c)    The Managers do not in any way guarantee the return of any Member's Contribution or a profit for the Members from the Company's business.

A Manager may, but need not, be a Member of the Company.

Section 4.6    Term of Manager
Each Manager shall hold office and have the terms and responsibilities accorded to him or her by this Agreement until resignation or removal by the Members.

Section 4.7    Election of the Manager
Each initial Manager shall hold office until the earlier of the first annual meeting of the Company or until resignation or removal by the Members.

The Members shall thereafter vote in accordance with Section 3.6 to elect or designate any subsequent Managers of the Company. Any Manager of the Company may be removed or replaced with or without

cause by a vote of a Majority in Interest of the Members entitled to vote thereon.

Section 4.8    Action by the Manager
The Managers shall manage the Company by the affirmative vote of a majority of the Managers. Any action required or permitted to be taken by the Managers may be taken without a vote if all of the Managers consent thereto in writing and such writing is filed with the records of the Company. The Managers may participate in a meeting by means of telephone or similar electronic communications equipment which permits all persons participating in the meeting hear and speak to each other. Such participation shall constitute presence in person at such meeting.

Section 4.9    Resignation of the Manager
A Manager may resign at any time by giving written notice to the Company.

However, if such resignation violates any provision contained in this Agreement or the provision of any contractual agreement between such Manager and the Company, the Company may recover from such Manager damages for such breach as provided in this Agreement or by contract or law.

The election of a Manager shall not in and of itself create contract rights in favor of any such party.

Section 4.10    Vacancies
Vacancies occurring among the Managers shall be filled by the vote of a Majority in Interest of the Members entitled to vote thereon.

Any Manager chosen to fill a vacancy shall serve the unexpired term of his or her predecessor.

Section 4.11    Fees
The Company may, but shall not be obligated to pay fees to the Managers, or any accountants, agents, attorneys, consultants or advisors to the Company.

Such fees will be in compensation for services rendered to the Company.

Any such fees shall be treated as expenses of the Company and shall not be deemed to constitute Distributions to the recipient of any Profit, Loss or capital of the Company.

The obligations of the Managers to be performed under this Agreement will not be affected by a failure of the Company to pay fees under this Section 4.11.

Section 4.12    Reimbursement
The Company shall reimburse the Manager for all ordinary and necessary out-of-pocket expenses incurred by them on behalf of the Company.

Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing the Net Cash Flow and shall not be deemed to constitute a distributive share of Profits or a Distribution or return of capital to the Managers, and such reimbursement shall be made out of the assets of the Company (including the proceeds of the initial sale of Membership Interests) to the extent possible.

The Manager's sole determination of which expenses may be reimbursed and the amount thereof shall be conclusive.

The obligations of the Manager to be performed under this Agreement will not be affected by a failure of the Company to reimburse expenses under this Section 4.12.

The Managers shall be entitled to charge the Members in accordance with their Membership Interests to the extent necessary in order to collect reimbursement hereunder.

Section 4.13     Indemnification

To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Manager from and against any and all losses, claims, damages, liabilities or expenses of whatever nature, as incurred, arising out of or relating to the fact that such party was or is a Manager of the Company.

Notwithstanding the foregoing, no indemnification may be made to or on behalf of a Manager if a judgment or other final adjudication adverse to such Manager establishes:

      (1)      that his or her acts were committed in bad faith or
      (2)      were the result of active and deliberate dishonesty
      (3)      were grossly negligent
      (4)      were material to the cause of action so adjudicated, or
      (5)      that the Manager personally gained a financial profit in fact or other advantage to which

he or she was not legally entitled.

Section 4.14     Interested Manager

(a)     No contract or other transaction between the Company and one or more of the Managers or between the Company and any other limited liability company or other business entity in which one or more of the Managers are managers, directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone or by reason alone that such Manager or Managers were present at the meeting of Managers which approved such contract or transaction, or that his or her or their votes were counted for such purposes,

(1) if the material facts as to such Manager's interest in such contract or transaction and as to any such common managership, directorship, officership or financial interest are disclosed in good faith or known to the other Managers, and the Managers approve such contract or transaction by a vote sufficient for such purpose without counting the vote of such interested Manager or, if the votes of the disinterested Managers are insufficient to constitute an act of the Managers pursuant to the terms hereof and by unanimous vote of the disinterested Managers; or

(2) if the material facts as to such Manager's interest in such contract or transaction and as to any such common managership, directorship, officership or financial interest are disclosed in good faith or known to the Members entitled to vote thereon, and such contract or transaction is approved by the vote of such Members.

(b)     Common or interested Managers may be counted in determining the presence of a quorum at a meeting of the Managers that approves any such contract or transaction.

Section 4.15     Election of Officers

The Manager shall have the authority to appoint officers to act on behalf of the Company, including a president, one or more vice-presidents (the number, if any, to be determined by the Manager), a chief financial officer, a secretary, and a treasurer, each of whom shall be elected by the Manager.  The Manager shall determine what, if any, offices shall be created.  Such other officers and assistant officers as may be deemed necessary may be elected or appointed by the Manager.  The salaries of such officers shall be fixed from time to time by the Manager, and no officer shall be prevented from receiving such salary by virtue of the fact that he is also an Additional Member or Manager of the Company.

Section 4.16     Advisory Board

(a)     The Manager will appoint certain individuals as advisors to the Company (the "Advisory Board").

(b)     The Advisory Board will be initially comprised of such persons as are designated by the Manager. In addition, the Manager will be an ex-officio member of the Board.

(c)     At least twenty percent (20%) of the persons on the Advisory Board must reside in, or have substantial direct personal involvement in or experience in advising others who own or operate a businesses that operates in a Low Income Community as defined in IRC § 45 D (e)(i), as amended and

implementing federal regulations.

(d)     The Advisory Board will provide advice regarding the development and implementation of the Company's strategy for development of low income communities and will also provide advice about the near and long term-planning of the Company's business.

(e)     Persons serving on the Advisory Board will be required to made sufficient periodic contacts with persons who reside in, or have substantial direct personal involvement in owning or operating businesses that operate in Low Income Communities as defined in IRC § 45D(e)(i), so that they can provide meaningful, periodic reports to the other persons on the Advisory Board and the Manager as to community development and economic development issues generally and the Company's status in achieving community development or economic development.

(f)     The Advisory Board will meet at least semi-annually.

(g)     Persons serving on the Advisory Board shall not be employees of the Company; however, in the discretion of the Manager, Advisory Board members may receive reasonable consulting fees and expense reimbursement.  Advisory Board members may have consulting agreements with entities other than the Company, some of which are or may become competitors of the Company.

(h)     Persons serving on the Advisory Board need not be Additional Members of the Company.

(i)     The Manager may change the composition of the Advisory Board from time to time to reflect the Company's developing business status.

(j)     No Person serving on Advisory Board who is also an Additional Member shall incur additional liability solely by reason of having been selected or having served as a Member of the Advisory Board.

(k)     No Member of the Advisory Board who is also an Additional Member shall have a greater power than any other Member to act on behalf of or bind the Company.

(l)     The Manager will normally attend and participate in the meetings of the Advisory Board.  When the Manager is unable to attend a particular Board Meeting because of extenuating circumstances, he shall appoint an employee from the Manager to attend the Board meeting and prepare a report for the Manager about the Board proceedings which shall be accompanied by minutes of the meeting.

## __ARTICLE FIVE__          __Membership__

Section 5.1     Nature of Interest
A Membership Interest in the Company is personal property.  A Member has no interest in specific property of the Company.

Section 5.2     Admission of Members
Following the effective date hereof, a Person may be admitted as a Member of the Company through the transfer or assignment of a Membership Interest upon the vote or written consent of a Majority in Interest of all of the Members in the Company.

Section 5.3     Transfers and Assignments of Member Interests
A Membership Interest is assignable in whole or in part.

The assignment of a Membership Interest does not dissolve the Company.

Section 5.4     Rights of Assignees to Become a Member
An assignee of a Membership Interest shall not be entitled to participate in the management or affairs of

the Company or to exercise any rights or powers of a Member.

An assignee shall have no liability as a Member solely as a result of an assignment.

However, the assignee of a Membership Interest may be admitted as a Member upon the vote or written consent of a Majority in Interest of all of the Members in the Company.

An assignee who becomes a Member shall succeed to the rights, powers, preferences and limitations, and shall be subject to the restrictions and liabilities of a Member.

Section 5.5     Liability on Assignment
Whether or not an assignee of a Membership Interest becomes a Member, the assignor of a Membership Interest is not released from any liability under the Act or this Agreement, except as provided by the Act with respect to liabilities that arise either after the effectiveness of the assignment or, if the assignee becomes a Member, before the assignment.

A Member shall cease to be a Member upon the assignment of his or her Membership Interest.

Section 5.6     Withdrawal of a Member
A Member may not withdraw from the Company without the vote or written consent of at least two-thirds in interest of the Members or as otherwise provided in the Act.

Section 5.7     Liability of Members, Managers and Agents
(a)     Neither a Member, a Manager nor an agent of the Company (including a Person having more than one such capacity) shall be liable for any debts, obligations, or liabilities of the Company or of each other, whether arising in tort, contract or otherwise, solely by reason of being a Member, a Manager or agent or acting (or omitting to act) in such capacities or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the Company.

Each of the Members shall be liable only to make payment of his or her respective Contribution hereunder and other payments as expressly provided in this Agreement.

No Member shall be required to lend any funds to the Company or, after such Members Contribution has been paid, except as required by the provisions of the Act and Sections 4.12 and 6.10 hereof, to pay any further capital or Contribution, assessment or payment to the Company.

(b)     No Member shall be liable for the return of any portion of the Contribution of any other Member, the return of such Contributions shall be made solely from Company assets.

No Member shall be required to pay the Company or any other Member any deficit in the Member's Capital Account upon dissolution or otherwise.

Section 5.8     Parties to Actions
No Member of the Company is or shall be a proper party to proceedings by or against the Company, except where the object of such proceedings is or shall be to enforce a Member's right against or liability to the Company.

## ARTICLE SIX     Contributions, Capital Accounts, Allocations and Distributions

Section 6.1     Capital Contributions
(a)     The Contribution of a Member to the capital of the Company shall be in cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to render services.

Each of the Members has made a Contribution to the Company in the amount shown on the signature

page hereof.

(b)       Subject to the provisions of Sections 4.12 and 6.10 hereof, no Member shall be required to make any Contribution to the Company other than that set forth on the signature page hereof..

No Member shall be entitled to withdraw any part of his or her Capital Account or Contribution except as expressly provided in this Agreement.

Section 6.2       Maintenance of Capital Accounts

(a)       A Capital Account shall be established in the Company's books for each Member by the Managers in accordance with the rules of Treasury Regulation Section l.704-l(b)(2)(iv).

(i)       Each Member's Capital Account shall be increased by:
   (1)       such Member's cash Contributions to the Company; plus
   (2)       the fair market value of the property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to); plus
   (3)       the amount of Profits allocated to such Member.

(ii)       Each Member's Capital Account shall be decreased by:
   (1)       the amount of money distributed to such Member by the Company; and
   (2)       the fair market value of the Property distributed to such Member by the Company (net of liabilities secured by such Property that the Member is considered to assume or take subject to); and
   (3)       the amount of Losses allocated to such Member.

(b)       In accordance with Treasury Regulation Section l.704-I(b)(2)(iv)(e), immediately prior to the actual or deemed distribution of any Company asset, the Capital Accounts of all Members shall be adjusted (consistent with the provisions hereof) to reflect the manner in which the unrealized income, gain, loss and deductions inherent in such property (that has not been reflected in the Capital Accounts previously) would be allocated to the Members if there were a taxable disposition of such property for the fair market value of such property on the date of distribution.

In determining such unrealized gain or unrealized loss, the aggregate fair market value of any such asset as of any date of determination shall be determined by the Managers using such reasonable methods of valuation as they may adopt.

(c)       The foregoing provisions and other provisions of this Agreement relating to maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulation.

In the event the Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such regulations, the Managers, without the approval of the Members, may amend this Agreement to reflect such modification, provided that such amendment is not likely to have a material effect on the amounts distributed to the Members pursuant to Article Eight upon dissolution of the Company.

Section 6.3       Allocations of Profits and Losses

Except as provided by Sections 6.4, 6.5 and 6.6, the Profits and Losses of the Company shall be allocated on the basis of the amount of the Contributions of each Member, but not including defaulted obligations to make Contributions, to the extent they have been received by or promised to the Company and have not been returned to any such Member.

For income tax purposes only, each item of gain, loss and deduction of the Company shall be allocated among the Members in accordance with their respective share of Profits or Losses (taking into account)

the special allocations set forth in Section 6.4 through 6.6), subject to the rules of Section 704(c)(1)(A) of the Code.

Section 6.4       Minimum Gain Chargeback Allocation

Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Article Six, if there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, to the extent required and in the manner provided by Section 1.704-2(g) of the Treasury Regulations.

The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and l.704-2(j)(2).

This Section 6.4 is intended to comply with the minimum gain chargeback provision of Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

Section 6.5       Qualified Income Offset

Except as provided in Section 6.4, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), which creates or increases an Adjusted Capital Account Deficit, then items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible;  provided however that an allocation made pursuant to this Section 6.5 shall be made if and only then to the extent that such Member would have an Adjusted Capital Account Deficit after all allocations provided for in this Article Six have been tentatively made as if this Section 6.5 were not in this Agreement.

This Section 6.5 is intended to constitute a "qualified income offset" within the meaning of Treasury Regulation Section l.704-l(b)(2)(ii)(d).

Section 6.6       Curative Allocations

The allocations set forth in Sections 6.4 and 6.5 (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  However, these Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company Distributions.

Accordingly, the Managers are hereby authorized to divide other allocations of Profits, Losses and other items among the Members as may be necessary to prevent the Regulatory Allocations from distorting the manner in which Company Distributions will be divided among the Members.

In general, the Members anticipate that this will be accomplished by specially allocating items of income, gain, loss and deduction among the Members so that the net amount of the Regulatory Allocations and such special allocations to such Member is zero.  However, the Managers shall have discretion to accomplish this result in any reasonable manner.

Section 6.7       Allocations and Distributions of Net Cash Flow and Property

Subject to this Article Six and except as otherwise provided in Article Eight hero to the dissolution of the Company), any Distribution of the Net Cash Flow during any Fiscal Year shall be allocated on the basis of the value, as stated in the records of the Company, if so stated, of the Contributions of each Member, but not including defaulted obligations to make Contributions to the extent they have been received by or promised to the Company and have not been returned to any such Member.

<u>Section 6.8</u>      <u>Distribution Rules</u>

(a)      Distributions may be made in cash or in kind.

The Managers shall not be obligated to make any Distributions hereunder at any time prior to the dissolution of the Company in accordance with Article Eight hereof.

All Distributions pursuant to Section 6.7 hereof shall be made at such times and in such amounts as shall be determined by the Managers to be in the interests of the Members; <u>provided however</u> that the Managers shall use their best efforts to, but shall not be obligated to, cause the Company to distribute to the Members an amount of Net  Cash Flow as shall be sufficient to enable the Members to fund their federal and state income liabilities attributable to their respective distributive shares of the taxable income of the Company.

(b)      All amounts withheld pursuant to the Code or any provision of any state or 1 with respect to any payment, Distribution or allocation to the Company or the Members will be treated as amounts distributed to the Members pursuant to this Article Six for all purpose Agreement.

The Managers are authorized to withhold from Distributions, or with respect allocations to the Members, and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state or local law and shall allocate such amounts to those Members with respect to which such amount was withheld.

<u>Section 6.9</u>      <u>Distributions in Kind</u>

A Member, regardless of his or her Contribution, has no right to demand and receive any Distribution from the Company in any form other than cash.

A Member may not be compelled to accept a Distribution of any asset in kind from the Company to the extent that the percentage of the asset distributed to him or her exceeds a percentage of that that is equal to the percentage in which he or she shares in Distributions from the Company.

<u>Section 6.10</u>      <u>Limitations on Distributions</u>

(a)      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a Distribution to a Member to the extent that, at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests and liabilities for which recourse of creditors is limited to specified property of the Company, exceed the fair market value of the Company, except that the fair market value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only that the fair value of such property exceeds such liability.

A Member who receives a Distribution in violation of this Section, and who knew at the time of Distribution that the Distribution violated this Section, shall be liable to the Company for the amount of the Distribution.

A Member who receives a Distribution in violation of this Section 6.10, and who did not know at the time of the Distribution that the Distribution violated this Section shall not be liable for the amount of the Distribution.

(b)      This Section 6.10 shall not affect any obligation or liability of a Member under this Agreement or other applicable law for the amount of a Distribution.

Unless otherwise agreed, however, a Member who receives a wrongful Distribution from the Company shall have no liability under this Agreement or other applicable law for the amount of the Distribution after the expiration of three (3) Years from the date of the Distribution.

Section 6.11    Distribution Upon Withdrawal

Except as provided in the Act, upon withdrawal as a Member of the Company as provided in Section 5.6, any withdrawing Member shall be entitled to receive:

(1)    any Distribution to which he or she is entitled under this Agreement and

(2)    within a reasonable time after withdrawal, an amount equal to the positive balance in such Member's Capital Account as of the date of withdrawal after taking into account all Capital Account adjustments for the Fiscal Year during which such withdrawal occurs.

## ARTICLE SEVEN    Accounting and Records

Section 7.1    Records

The Company shall maintain the following records:

(1)    the full name and mailing address of each Manager

(2)    for each Member, a current list of the Member's full name set forth in alphabetical order and the Member's last known mailing address, together with the Contribution and the share of Profits and Losses of each Member or information from which such share can be readily derived

(3)    a copy of the Certificate of Formation and all amendments thereto or restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed

(4)    a copy of this Agreement, any amendments thereto and any amended and restated Operating Agreement, and

(5)    a copy of the Company's federal, state and local income tax or information returns and reports, if any, for the three (3) most recent fiscal years.

The Company may maintain its records in other than a written form if such form is capable of conversion into written form within a reasonable time.

Section 7.2    Inspection

Any Member may, upon not less than ten (10) days' written notice to the Managers, inspect and copy at his or her own expense, for any purpose reasonably related to the Member's interest as a Member, the records referred to in Section 7.1, any financial statements maintained by the Company for the three (3) most recent fiscal years and other information regarding the affairs of the Company as is just and reasonable.

However, the Managers shall have the right to keep confidential from the other Members for such period of time as the Managers deem reasonable, any information which the Managers reasonably believe to be in the nature of trade secrets or other information the disclosure of which the Managers in good faith believe is not in the best interest of the Company or its business or which the Company is required by law or agreement with a third party to keep confidential.

## ARTICLE EIGHT    Dissolution

Section 8.1    Dissolution

Since the term of existence of the Company is intended to be perpetual, the Company shall be dissolved and its affairs shall be wound up only upon the earlier to occur of the following:

(1)    a vote or written consent of at least two-thirds in interest of the Members to dissolve or

(2)    the entry of a decree of final judicial dissolution under the Act.

Section 8.2    Judicial Dissolution

On application by or for a Member before a court with proper jurisdiction, the court may decree dissolution of the Company pursuant to the Act whenever it is not reasonably practicable to carry on the business in conformity with the Certificate or Agreement.

A certified copy of the order of dissolution shall be filed by the Manager or agent with the Secretary of

State of Delaware within thirty (30) days of its issuance.

Section 8.3    Winding Up

In the event of a dissolution of the Company, other than a judicial dissolution pursuant to Section 8.2 hereof, the Members may wind up the Company's affairs.

Upon the showing of cause, a court with proper jurisdiction may wind up the Company's affairs upon application of any Member, or his or her legal representative or assignee, and in connection therewith may appoint a receiver or liquidating trustee.

Upon dissolution of the Company, the Persons winding up the Company's affairs may, in the name of and for and on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, settle and close the Company's business, dispose of and convey the Company's property, discharge the Company's liabilities and distribute to the Members any remaining assets of the Company, all without affecting the liability of Members, including Members participating in the winding up of the Company's affairs.

Section 8.4    Distribution of Assets

Upon the winding up of the Company, the assets shall be distributed as follows:

(1) to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate reserves, other than liabilities for Distributions to Members pursuant to Sections 6.8 and 6.11 hereof,

(2) to Members and former Members in satisfaction of liabilities for Distributions under Sections 6.8 and 6.11 hereof, and

(3) to Members for the return of their Contributions and in respect of their Membership Interests in accordance with and to the extent of their positive Capital Account balances after taking into account all Capital Account adjustments for the taxable year during which such distribution occurs.

Section 8.5    Certificate of Dissolution

Within ninety (90) days following the dissolution and winding up of the Company, or at any other time there are no Members, A certificate of Dissolution shall be filed with the Delaware Secretary of State entitled "Certificate of Dissolution of  URBAN DEVELOPMENT FUND, LLC" under of the Limited Liability Company Act" and executed in accordance with the requirements of the Act.

The Certificate of Dissolution shall set forth:

(1) the name of the Company and, if it has been changed, the name under which it was formed,

(2) the date of filing of its Certificate and each subsequent amendment thereto or restatement thereof,

(3) the event giving rise to the filing of the Certificate of Dissolution, and

(4) any other information the Persons filing the Certificate of Dissolution determine.

The cancellation of the Certificate shall be effective at the time of filing of the Certificate of Dissolution.

The cancellation of the Certificate shall not affect the liability of the Members during the period of winding up and termination of the Company.

## **ARTICLE NINE**       **Miscellaneous**

Section 9.1    Amendments to this Agreement

This Agreement may be amended by the affirmative vote of a Majority in Interest of the Members, provided that no amendment to this Agreement is made without the written consent of each Member adversely affected thereby.

Section 9.2    Binding Provisions

The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

Section 9.3    No Waiver

The failure of any Member or Manager to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 9.4    Applicable Law

This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware without giving effect to conflicts of laws principles thereof.

Section 9.5    Separability of Provisions

Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid or unenforceable in any jurisdiction, such provision or provisions shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without invalidating the remaining provisions hereof, or the application of the affected provision to Persons or circumstances other than those to which it was held invalid or unenforceable, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.6    Entire Agreement

This Agreement constitutes the entire agreement among the parties.

This Agreement supersedes any prior agreement or understanding among the parties and may not be modified or amended in any manner other than as set forth herein or therein.

Section 9.7    Counterparts

This Agreement may be executed in several counterparts, all of which together shall constitute one agreement binding on all parties hereto notwithstanding that all the parties have not signed the same counterpart.

Section 9.8    Power of Attorney

Each Member, by executing this Agreement, does hereby irrevocably constitute and appoint the Manager, Michael Qualizza, with full power of substitution, as such Member's true and lawful attorney-in-fact (the "Attorney-in-Fact"), in his or her name, place and stead, to execute, acknowledge, swear to, deliver, file and record such documents which are now or may hereafter be required by law to be filed on behalf of the Company or are deemed necessary by the Manager to carryout fully the provisions of this Agreement in accordance with its terms.

The grant of authority in this Section 9.8 is a special power of attorney coupled with an interest in the Attorney-in-Fact and shall survive the death or incapacity of any Member, may be exercised for the Member by a facsimile signature of the Attorney-in-Fact, and shall survive any assignment by the Member of his or her Membership Interest.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**MANAGER:**

ARIES COMMUNITY CAPITAL, LLC

_____
Michael S. Qualizza, Vice-President


**MEMBERS:**

ARIES COMMUNITY CAPITAL, LLC

_____
Michael S. Qualizza, Vice-President
Capital Contribution       $990.00
Percentage Interest        99.99%


MICHAEL S. QUALIZZA

_____
Michael S. Qualizza
Capital Contribution       $10.00
Percentage Interest        0.01%


CHI\ 4100544.2